Kelby Estate

*Clarence K. Gundaker* of *Moore, Panfil & James*, for accountant and George W. Ufford, life tenant.

LEFEVER, J., March 28, 1952.—Textatrix died on October 10, 1937. Her net estate of $2,160.87 was awarded by Judge Bolger, in adjudication dated February 21, 1950, to the Frankford Trust Company, trustee under her will. The current account of the trustee has been filed to afford life tenant an opportunity to petition this court "to have the trust terminated".

The trust arises under the residuary clause of testatrix's will wherein she gave the residue of her estate in trust to pay the income therefrom to her son, George W. Ufford, for life, and upon his death to distribute the principal to his issue, per stirpes, and in default of issue to the sisters of decedent living at the death of life tenant. The will contains a spendthrift clause covering "both income and principal".

The life tenant is almost 64 years of age. He has been married three times, but has had no issue. He has not had, nor been capable of having, sexual relations for the past eight years. Before their marriage five years ago, both he and his present wife understood that they could not have children because of his impotency

and the hysterectomy performed upon her a number of years earlier.

Upon petition of life tenant, the auditing judge appointed David Turnoff, M.D., "to make a physical examination of George W. Ufford, petitioner, and to report to the court as to whether or not it is physically possible for George W. Ufford to have issue in the future". Dr. Turnoff, a prominent specialist in internal medicine, assisted by Dr. Horace Weinstock, a genito-urinary specialist, and by Dr. Scott P. Verrei, the family physician, made careful and exhaustive physical and laboratory tests in this case. In addition, Dr. Verrei had "treated Mr. Ufford for impotence since April 1950 with aphrodisiacs, prostatic massage, oral and parenteral testosterone, and psychotherapy, without the slightest benefit". The medical report concluded that Dr. Turnoff, Dr. Weinstock, and Dr. Verrei were of the "opinion that it is physically impossible for Mr. George W. Ufford to have issue in the future".

For many years there was an irrebuttable presumption of law that an individual was capable of having issue until the date of his death, irrespective of his age or physical incapacity. See Sterrett's Estate, 300 Pa. 116 (1930), and Straus' Estate, 307 Pa. 454 (1932). This inflexible rule has been relaxed in recent years to recognize the practicalities rather than pure theory. Accordingly, women have been judicially determined to be incapable of having issue upon medical proof of the performance of a hysterectomy: Honeywell Estate, 70 D. & C. 472 (1950); Cranston Trust, 1 Fid. Rep. 363 (1950); and Batchelor Trust, 1 Fid. Rep. 365 (1950). Likewise, women have been determined to be incapable of having issue upon the basis of medical testimony that they had completed the menopause or had reached an age at which medical statistics indicated that child bearing did not occur: Leonard's Estate, 60 D. & C. 42 (1947); Lare's Estate,

57 D. & C. 163 (1946) ; Barnsley's Estate, 59 D. & C. 653 (1947) ; Daly's Estate, 26 Dist. R. 299 (1917) ; see Macfarlan Trust, 1 Fid. Rep. 367 (1949) ; Brooke's Estate, 15 Dist. R. 137 (1905) (affirmed) 214 Pa. 46 (1906) ) and Gowen's Appeal, 106 Pa. 288 (1884). So also, where medical examination by four experts produced the unanimous opinion that the "Fallopian tubes . . . were occluded" and "that this condition, due to an infection, cannot be changed by operative procedure", a 27-year-old woman was held incapable of having issue: Bell v. Lebanon Casualty Trust Company Trustee, 66 D. & C. 624 (1948).

The theory upon which the cited cases proceed is aptly stated by Judge Augustus N. Hand in City Bank Farmers' Trust Co. v. United States, 74 F. (2d) 692, 693, 694 (C. C. A. 2nd, 1935), as follows:

"It is true that the medical books contain a trifling number of cases, how well authenticated we do not know, where women 59 years of age and over have borne children. But, since verification of offspring to women of 55 years and over began to be attempted by the United States Department of Commerce, there have been from the years 1923 to 1932, inclusive, no recorded births to such women. During that period the total number of births was 20,389,873, without a single child having been borne to a woman of 55 years or over. In view of the statistics, we may conclude that the chance that the life tenant here would have issue after the death of the testator was negligible.

". . . the statistics show that in the case of a woman between 50-54 years of age there is the slight chance of .0001 that she may have children. Therefore, while it is not necessary to say that possibility of issue must be treated as extinct among women between 50 and 54 years of age, it seems clear that those beyond the latter age are to be regarded as wholly past childbearing. . . . The certainty that a woman who has reached

50 years will not bear children is far greater than that which attends most other human affairs and to which rules of law have to be made and applied."

No cases have been cited by counsel, and independent research has failed to reveal, any case in which a judicial finding has been made that a man is incapable of having issue. This absence of cases is probably owing to the uncertainty and difficulty of determining medically that a man is sterile.

In recent years medical science has progressed rapidly in diagnosis and prognosis. What formerly was mere conjecture is now accepted fact. Even so, the medical profession can speak with absolute and uncontrovertible certainty on only a limited number of matters. Nonetheless, in other fields of the law the courts have been content to accept medical *opinion* and adjudicate cases involving life, liberty and property upon the basis thereof. Daily, physicians testify as to the extent of injuries and the disability flowing from them in tort cases and juries and judges return verdicts based on such opinion. Likewise, psychiatrists testify as to their opinion of the sanity or insanity of defendants in capital cases and juries and judges impose or withhold even the death penalty on such opinion. In other cases, on the basis of similar medical opinion, individuals may be deprived of their freedom and confined in mental institutions.

The difficulty of ascertaining with exactness and definiteness that a man is sterile is conceded. However, it appears that such a diagnosis is no more uncertain than that in each of the above illustrations. There seems to be no justification for courts not to make a finding of sterility of a male where the medical facts strongly so indicate. For example, if a man by surgery or accident has been castrated, his sterility can be determined absolutely. So also, in cases of disease and similar situations.

6

The instant case is an excellent example. The life tenant has testified that he has neither had, nor been able to have, any sexual relations for eight years, during five of which he was married to a new wife with whom he was eager to have such relations. In addition, three well-known experts in the medical profession: an internist, a genito-urinary specialist, and a general practitioner, have made exhaustive physical and laboratory tests on the life tenant. All of these tests led them to the measured conclusion that the life tenant "is impotent and sterile".

There would seem to be no real distinction between a woman, who has passed the menopause or who has infected and occluded Fallopian tubes, and a man, who, by reason of age or physical disability, according to competent and acceptable medical opinion, is equally incapable of procreation. The auditing judge is satisfied from the evidence and finds as a fact that life tenant in the instant case is incapable of having issue.

Isabella Cox and M. Elizabeth Challenger are the sole surviving sisters of decedent. Each of them has assigned to life tenant all of the "right, title and interest, vested and contingent, in and to all property and assets of the estate of my sister . . . to which I may be entitled." This invests George W. Ufford with the remainder as well as the life interest in the trust.

"Although a trust may not have ceased by expiration of time, and although all of its purposes may not have been accomplished, yet if all the parties who are or may be interested in the trust property are in existence, and sui juris, and if they all consent and agree thereto, courts of equity may decree the determination of a trust . . .": II Hunter, Pennsylvania Orphans' Court Commonplace Book 1303; see also Foyle's Estate, 26 Dist. R. 751 (1917); A. L. I. Restatement of the Law of Trusts, §338, and Pennsylvania Annotations.

A trust whose purpose remains unfulfilled may not be terminated: Rehr v. Fidelity-Philadelphia Trust Co., 310 Pa. 301 (1933); Appeal of Twining, 97 Pa. 36 (1881). However, if the only unfulfilled purpose is that which a spendthrift trust or a sole and separate use trust is designed to accomplish, a settlor and all beneficiaries may compel termination of an inter vivos trust: Bowers' Trust Estate, 346 Pa. 85 (1943). The Supreme Court in dictum in the cited case distinguishes between cases where settlor is alive and consents to termination of the trust, and cases where settlor or testator is dead and, therefore, cannot consent. This would seem to be an illusory distinction because the settlor of an irrevocable trust divests himself of all interest in the trust res (except as he may be a beneficiary of the trust). Moreover, if the terms of the instrument are unambiguous, he is barred from testifying as to its meaning. And it would appear that he was prohibited from testifying as to his present or past intention regarding the instrument or the trust res. It would seem to follow, therefore, that there is no real difference between the two situations and that the doctrine of Bowers' Trust should be extended to testamentary trusts. Particularly is this so, in the cases of small or nuisance trusts or where the "failure of purpose" doctrine is applicable. This has been done in a number of such testamentary trusts despite spendthrift clauses: Honeywell Estate, 70 D. & C. 472 (1950); Auchu's Estate, 38 D. & C. 34 (1939); Happold Estate, Philadelphia Orphans' Court, 1486 of 1945 (unreported adjudication of Judge Ladner).

In the instant case, all of the parties interested have consented to the termination of the trust. The trust res is small. The only impediment is the spendthrift clause. Under the facts in this case, this should not require the continuance of the trust.

"Were this trust not stricken down at this time and the principal awarded to . . . [life tenant], we would have the absurd situation of the principal of the fund going to . . . [his] estate at the time of . . . [his] death and thence to the beneficiaries under . . . [his] will, or if . . . [he] left no will, then to . . . [his] heirs under the intestate laws. This would be a clear frustration of the original testator's intention . . . ." Lare's Estate, 57 D. & C. 163, 165 (1946). It would seem, therefore, that this trust should be terminated.

Irrespective of the correctness of the above analysis, this trust is terminable under the "failure of purpose" doctrine. The principal of this trust estate is only $2,129.48 and the income therefrom amounts to the meager sum of $150 a year. The continuance of such a trust serves little purpose and should be terminated: A. L. I. Restatement of the Law of Trusts, §336; Auchu's Estate, 38 D. & C. 33 (1939); Tomlinson v. Land Title Bank & Trust Co., Philadelphia Common Pleas Court No. 2, December term, 1938, no. 2144 (unreported); Riemer v. Provident Trust Co., Philadelphia Common Pleas Court No. 4, December term, 1936, no. 1295 (unreported).

"It has for some time been established that where the income beneficiary is the primary consideration of testator or settlor with the view of providing the comfortable maintenance of such primary beneficiary, and, on account of the insignificance or inadequacy of the income to accomplish this purpose, the intent of testator or settlor is frustrated, the court will terminate the trust and award the principal to the income beneficiary in order to enforce that intent, regardless of who are the remaindermen, if they be regarded as of secondary importance in the contemplation of testator or settlor: Auchu's Estate, 38 D. & C. 33 (1939), supported byA.L.I. Restatement of the Law of Trusts

Sec. 336, p. 1019; Miller's Estate, 33 Berks 89 (1940) ; and Posey Estate, 52 D. & C. 127 (1944)": Honeywell Estate, 70 D. & C. 472,474 (1950).

The instant case is more compelling because the principal is $2,160.87 instead of $22,000 in the quoted case.

In employing the doctrine of "failure of purpose" to strike down an oppressive trust the courts have ascribed to settlor or testator an intention (possibly more general than specific) to make adequate financial provision for the income beneficiary and, when continuance of the trust would jeopardize fulfillment of that intention, employ their equitable powers to terminate. The instant case deserves such construction. The auditing judge rules, therefore, that there has been a "failure of purpose" of the instant trust. Accordingly, the trust will be terminated.

This case falls expressly within the language and intent of section 2 of the Estates Act of April 24, 1947, P. L. 100. It is the type of trust and situation which that act was designed to relieve. But, by the express terms of section 21 of the Estates Act, the operation of section 2 is confined to trusts created on and after January 1, 1948. Being prospective in nature only, the act does not apply to this trust, which came into existence prior to that date. However, this act states the public policy of Pennsylvania, as expressed by its legislature, with regard to termination of trusts. Courts may properly bear in mind expressed public policy when passing upon such matters, and where there is any doubt frame their decisions in conformity with such public policy. See Vederman Estate, 78 D. & C. 207 (1951). This theory further supports the decision here reached to terminate this trust.

Accordingly, the trust under decedent's will is stricken down and the balance, principal as shown by the account, $2,034.87, composed as indicated, together

with income, $94.61, and any additional collections thereof to the time of actual distribution, is awarded to George W. Ufford, absolutely.

Payment and distribution is so decreed, with leave to make any and all necessary assignments and transfers.

And now, to wit, March 28, 1952, the account is confirmed nisi.